Good morning. I'm Lauren Coppola, here for Appellant Free Conferencing Corporation. There are numerous reasons why the judgment of the lower court should be reversed, but the most simple and straightforward is that free conferencing cannot be held liable for cautiously interfering with a contract that had already been breached. That breach began three years prior to Free Conferencing's involvement with Techstar, the third party, and continued uninterrupted through Free Conferencing's involvement with Techstar in 2008. It would have continued without Free Conferencing's involvement. But Free Conferencing was involved, so it seems a bit of an odd argument to say that because someone else has already breached this tariff, we can step in and join in and have no consequences from our actions. Isn't it sort of a breach by breach by breach? No, it's not. The Minnesota law requires that there be but for causation for the breach. Continuing a breach, aiding a person who has already even contemplated a breach, is simply not enough under the applicable law here. So under your theory, there is only one breach, and that each action taken is not a single act of breaching. There's just an initial breach and a continuation of it? There's a continuation of the breach. However, we're talking about the tort here of procuring a breach. There needs to be a but for causation. So each month may have been a breach, for instance, for the purposes of the statute of limitations. Quest cites a few of those cases that each month a bill improperly goes out, reruns the statute of limitations. But here it's different. We're talking about a tort, and to have intentional procurement means you make a third party do something it otherwise wasn't doing and wasn't inclined to do in the first place. And so here, the act of billing was the breach. Now, I'm not conceding at all that that was a material breach, and I'll get to that. I don't think it was. However, putting that issue aside, the billing each month was the breach. That billing began in 2005, and by 2008, the bill contained 27 different free service companies. The bill would have went out whether or not free conferencing call traffic was on it or not. That's simply insufficient to establish the intent of this tort here. Now, the lower court glosses over that point, but it misses the point that it's the tortfeasor causing the third party to do something it otherwise would not have done. Again, assisting in a breach or inducing a breach, as established by the law, is simply insufficient. And so on the issue of procurement, the intentional interference with the contract here fails. Now, I think that's the most straightforward ground for reversal here, no but for causation. However, there is also the important issue of the court's failure to apply collateral estoppel. Now, this court has dealt with these issues before, and that's in the SanCon case. The legal doctrine of collateral estoppel mandates a reversal of the decision below with respect to the issues of free conferencing's intent, its purpose, its justification of its actions, and whether that breach was, in fact, material. The district court focused on the different years at issue here, and it's no longer SanCon. It's TechSTAR. Isn't that enough to shift this off of the collateral estoppel just by those fact findings? It's not. So in the SanCon case, the district court of South Dakota looked at all of the circumstances from 2005 through 2009. In fact, the court said that it looked at the long, winding, contentious path of access stimulation, and it did not do so in a focused on free conferencing's actions and its intent from 2005 all the way through 2009. So even though there are two different companies here that they're interacting with, it's your position that you could establish that the intent is the same as to both TechSTAR and SanCon? Yes, correct. And that is because all of the same evidence was looked at in both SanCon and TechSTAR. In the lower court, all of the same exhibits were admitted into trial. SanCon and TechSTAR are the same. The testimony taken in the SanCon matter was admitted at trial here. Quest Council cross-examined free conferencing witnesses on the same topics. And moreover, Quest's witnesses said that the free conferencing deals were the same everywhere. And so all of the same evidence was looked at. The same questions were asked. All the parties had a full and fair opportunity to be heard. Was the law sufficiently similar that the facts that were found could be concluded to be estopped? Yes. Or could be estopped from changing them? Yes. Help me out with that. The elements of the intentional interference are virtually identical. And both Minnesota and South Dakota look to the restatement. Is that pretty clear that both are looking to the restatement sufficiently the same that it collapses the two analyses? That's correct. The same elements both look to the restatement. In both cases, there was a review of the improper purpose and the intent. And here, rather than in SanCon, the court found and the 8th Circuit affirmed that free conferencing did not act with an improper purpose. That it was not until 2009 when the Federal Communications Commission issued Farmers II that it appeared free conferencing's business model violated the tariff. There was also a finding by South Dakota and this court that free conferencing's intent was simply to take advantage of a regulatory system that was unclear until 2009. And that covers this same period here. So you say this case does not cover a period post-Farmers II? This case does not. This case, the contract was entered into in 2008. And so it's the same overlapping time period. Farmers II was issued in 2009. Well, the damages here were around a million dollars or so, as I recall. Am I correct? That was the judgment. I dispute that those are damages. Well, whatever. That was the award. What time period does that cover? That covers beginning in mid-2008 through, I believe, 2010. Okay. So is there not at least some time period that follows the Farmers II case that would overlap here? Payments were made post-Farmers II. However, all of the actions, the intentional procure or the actions upon which liability has been based here is pre-Farmers II. And so because of the issues, the law is identical. The issues were identical. The parties were identical. And the same evidence was admitted at both trials, the doctrine of collateral estoppel should apply. Now, even if the fact that these issues, the issue of intent and justification and purpose should not have been relitigated, the court's decision on those issues is not supported by substantial evidence. So putting the collateral estoppel issue aside, looking at the facts admitted in this case, there's just simply not enough to establish an improper purpose and an intent to interfere. So here, there's two witnesses, David Erickson and Shornack. And they provide undisputed evidence that the only reason free conferencing entered into an agreement with Techstar was to take advantage of the Techstar agreement with AT&T. It had absolutely nothing to do with the tariff bills that were being issued to Quest. In fact, Quest had declared that it was not paying its tariff bills. It aggressively pursued cases against other local exchange carriers. In 2007, the world had known Quest had stopped paying tariff bills. In fact, Shornack testified that it told free conferencing Quest wasn't paying its bills. There is no evidence to support a finding that free conferencing entered into an agreement with Techstar to cause it to issue bills to Quest. The district court made some credibility findings or some determinations about the knowledge that free conferencing had about what was going on with the farmers case and the potential fraud. Isn't that a fact finding that we would review, putting aside collateral estoppel, that we would review for clear error? It is, and I believe there was clear error on that. The issue of the knowledge of the backdating, the fraudulent documents, there is no substantial evidence to support special knowledge. Free conferencing in June 2007 was asked to backdate an agreement. That's all it knew. It was asked to backdate the agreement. But in January of 2008, the Federal Communications Commission granted a petition for reconsideration on Farmers 1, and that was based on Quest's allegation that there was fabricated evidence. Months before Techstar entered into an agreement with free conferencing, the entire world knew that there was a possibility of fabricated evidence impacting the Farmers 1 decision. So that was all public knowledge. There was no special knowledge that free conferencing had prior to its entering an agreement with Techstar that gave it any improper purpose. And I don't think the Court's judgment on those issues was supported by substantial evidence. Now, as I've stated, there is undisputed evidence that the reason free conferencing entered into an agreement with Techstar was to take advantage of that deal with AT&T. Free conferencing knew Quest was not paying. Now, finally, to not miss this point, the breach here was not material. And this is something that the Sancom Court found. The calls were delivered. This is a federal tariff. The calls were placed. The calls were delivered. This was simply a billing dispute, a billing dispute as evidenced by Quest's letter to Techstar in 2008. It said, we dispute the bills, we're not paying any past bills, and we're not going to pay any forward bills for this type of traffic. And it listed seven or eight reasons why it wasn't going to do that. But no call traffic was hindered, delayed, prevented. And the Sancom Court, which should be given the weight it deserves, found that to quote the court, that the contract itself was unaffected by that billing. It was just simply found that the calls that were billed couldn't be billed under the tariff, but the agreement was not materially breached. And so the claim for intentional interference is based on an error of law. And we need to go back to the what I would call the damages issue. You disagree with that choice of word, but the Farmers II decision was rendered in 2009. And as I understand it, after that decision, there were calls terminated to free conferencing under this LCR protocol. And bills were submitted to Quest for those calls that were terminated after the date of the Farmers II decision. Am I incorrect in that? No, I believe you are correct. So isn't some part of this judgment, even under your view of the case, isn't some part of this properly awarded? No, it's not. And so here's the issue with the damages. These damages were of Quest's own making, essentially. In April 2008, it says we're not going to pay anymore. And it sticks to that for about three, four months. And then all of a sudden, its lawyers decide that the regulatory landscape is so unsure that it decides to implement this 50% rule. And it does so solely to reduce its exposure to TechSTAR, in case Quest is wrong and TechSTAR is right. These damages are not recoverable because they're not foreseeable, and they're not damages. They're simply a result of a legal strategy to reduce exposure. And so under no circumstances do I believe those damages are recoverable. Counsel, you rely on footnote 96 of the Farmers II decision in your damages argument. I'd like to have you address the just and reasonable rate issue, if you could do so. Yes, sir. The Farmers footnote 96 refers to that even if the local exchange carrier couldn't recover under the terms of its tariff, that it was still a value provided, and that it could recover a just and reasonable rate. In our papers, we've submitted that the just and reasonable rate could be the rate that Quest decided to pay those lease cost routers. It found that market rate to be one that it used to connect the calls. And so at the very least, if the court sees any damages, which I don't believe there are, that should be considered the rate that it would have paid or should have paid to connect those calls. Has the FCC ever elaborated on that language? Unfortunately, Your Honor, it has not, but it is still good law, and it has been referred to ad nauseum since 2011. If the court has nothing further, I'd like to reserve my last moments for rebuttal. Thank you. You may proceed when you're ready. May it please the court, Chuck Sties on behalf of the Apple Lead Quest Communications, and last I was here, Judge Shepard, I was in front of Your Honor as well as Judge Murphy, and so my sincere condolences to her family too. After a lengthy trial, Judge Davis correctly found that free conferencing intentionally induced Techstar to assess access charges to Quest in violation of tariff. Judge Davis also found, based on ample evidence, that free conferencing knew those charges would be illegal at the time they entered into the contract. Given that his decision is supported factually and legally, we respectfully request that this court affirm. I need to start with the collateral estoppel. Why isn't this the same issue over the same time period with the same parties and essentially the same law, such that this would be sort of the classic reason why you can't keep going into different courts and getting different assessments from different judges on the same exact issue? Your Honor, there's a myriad of reasons why that's not true. What's the best reason why all of that is not true? First of all, it's interesting that Quest in the SanCon case argued that the court was collaterally estopped from discussing intent because in the Farmers 2 case, the FCC had expressly found that free conferencing expressly structured its contract and, quote, intended from the very beginning and, quote, purposefully deviated from the tariff at the time it entered into its contracts. So we argued collateral estoppel and the court said, no, I have to evaluate the case here because this isn't Iowa, even though it was the exact same time frame. Now we go here, and this case is materially different. The issue that was presented in the 2016 decision was whether in February 2005, when SanCon entered into a contract with free conferencing, whether free conferencing knew at the moment of the contract whether or not what it was doing was illegal. On four separate occasions in the 2016 decision, this court says the issue is whether at the specific moment the contract is entered into, whether or not they knew it was legal or illegal at that time. Now, here, what's the issue? The issue is whether free conferencing knew when it contracted with TechStar in April 2008, over three years later, whether it was acting in an illegal manner. And much had happened in that three-year time frame. Quest had sued, among others, free conferencing in Iowa, claiming what it was doing wasn't legal. Free conferencing had received emails from Farmers, one of its lack partners in Iowa, saying unless you're paying bills, there's an argument you're not an end user. They got backdated invoices and contracts to try and rectify that. And then the Farmers, one decision issues based upon what free conferencing knew was fabricated evidence. But then the critical fact. In January 2008, the FCC issued its decision on reconsideration and said specifically, unless you are a paying end user customer, tariff charges do not apply. At trial in this case, David Erickson testified that he was aware of that decision. Was aware he had to be a paying end user customer for tariff charges to apply. And despite that, three months later, aggressively pursued and induced TechStar to enter into a contract to provide services to him without charge. So he knew, and he testified he knew, that that contract violated the tariff at the time he entered into it, three years and three months after the Sandtown contract. You're saying he testified that he knew it was in violation of the tariff, or that he just knew he had to be an end user? To me, that's the same thing. In order to be an end user, he has to be paying. And for tariff charges to apply, he has to be an end user. And he knew Quest was going to be billed tariff charges under the contract. And he knew that because of that, because of the contract with AT&T, there was these preferential differential rates and Quest's calls were going to go to AT&T. And he was going to get paid on it, which Judge Davis found motivated him to enter into this contract. So the whole landscape is completely different. The facts are different. The lek is different. The contract is different. The timing is different. Everything is different. And then your Honor asked the right question earlier below, and that is, was the law different too? And the answer is yes. When you look at the law, it's true. South Dakota says, we look to the restatement. They say that. At the same time, they don't. They specifically found in South Dakota that if you do not know at the time that you're interfering with someone, that what your actions are is illegal, that exonerates you. In contrast, Minnesota is different. Minnesota law looks at the restatement, section 766, comment I. And 766 comment I specifically says, it's not necessary that the actor appreciates the legal significance. If the actor, which here is free conference, knows the facts, he is subject to liability even though he is mistaken as to legal significance. In other words, under Minnesota law, ignorance of the law is no excuse. That's the Burlington case in Minnesota. In addition, the Camille case out of the Supreme Court said the exact same thing. When we asked for a hearing before this court, we brought these very cases to the court. And free conferencing said, wait, that's the restatement. South Dakota law is different. And now they're arguing South Dakota law is the same. Why? Because it's convenient. The whole point is the law is different, the facts are different, collateral is different. Let's turn now to what about this? I asked this question about the farmer's two decision. And it's clarification about what is an end user. Does some of the damages that were awarded here, does it span post-farmer's two? Absolutely. The damages here goes from April of 2008 through March of 2010. Farmer's two issued November of 2009. So it does constitute four months after the fact of additional damages after farmer's two. However, farmer's two on the very point that's critical here, whether they're an end user changed nothing from January of 2008. With the FCC made plain you had to be a paying end user customer, and Mr. Erickson testified he was aware of that decision at the time. So the farmer's two decision clarified for everyone. In January of 2008, David Erickson was very much aware of the decision that showed his business model was illegal and he still continued to move forward without hesitation, just as Judge Davis found. Now, you're referring to, help me recall here, you had farmer's one, then you had a decision where the FCC had been presented, was presented with information, and indicated, rendered a decision that it was going to review, take another look at this topic, right? And then we have the third decision, which is farmer's two. That's always strange. We call it farmer's one, farmer's two, and farmer's two, but you're right. Or farmer's one recon. The first decision did more than say we're going to look at it again. The first decision specifically held, and you have to look at the footnotes and look at the FCC rules, say farmer's one was no longer good law as of January 2008. And they specifically said that you have to be a paying end user customer. The only issue that needs to be decided in what you're referring to as farmer's two from November of 2009 was whether or not Quest was right and that this evidence had indeed been manufactured, the backdated invoices and contracts, and to show that they had never paid anything. So all farmer's two in November of 2009 did was say we've now evaluated the evidence and Quest is right. And as we said in farmer's one, frankly, and in farmer's one recon January 2008, if you don't have a paying end user customer, you're not entitled to assess access charges. And that was established from the beginning. And that's the very point, the critical point that Mr. Erickson knew. And what about, could you comment on, as I recall, one little twist of these decisions by the FCC is they were specifically not only prospective but retrospective also. I'm not sure I'm understanding Your Honor's question. Well, weren't they couched in terms of this is not only the law going forward, but this has always been. That wasn't in farmer's. That was in the Northern Valley decision. In the Northern Valley decision, both with Sprint and Quest as plaintiffs, the FCC specifically said the fact that you had to have a paying end user customer has been the law for 25 years, since 1984. And if you look at the regulations, the regulations specifically say you have to have a paying end user customer, and that regulation is embodied in the tariff. So the tariff language specifically says you have to have a paying end user customer. You just need to look at the tariff and not stick your head in the sand. And once you do that, it's obvious that this breach is occurring. I was going to move to a different topic, but I think I'm going to address Your Honor's question with respect to footnote 96 for a moment. And with respect to that, I respectfully disagree with my colleague who argued that the FCC has never addressed the footnote 96 question. In our papers, and I won't go into all of them, the WIMAX decision being one, the Northern Valley decisions being others, several all-American decisions, the FCC has said point blank. That footnote does not say you're entitled to compensation. It was an open question that the FCC left in Farmers To. And that loophole has been closed and closed again. And indeed, Judge Gritzner in the Southern District of Iowa was confronted with the very question and said it strains credulity to argue that this purported loophole has not been closed. And there is a recent decision not cited in our papers that just came down in January of 2018 out of the Ninth Circuit. And it's specifically, I'm getting to it, it's the caller ID for you case, 880 Fed 3rd 1048. And that case specifically looked at if the tariff doesn't apply and if there's no negotiated contract in place covering the calls in question, is there anything a competitive leg such as Techstar can do to recover some portion of the charges? And the court went through decision after decision after decision and said the answer is no. The entire purpose of the Communications Act is you have to have a contract or you have to have a tariff. And the only exception to the mandatory tariffing requirements of Section 203 of the Communications Act is a negotiated contract and they hadn't been here. That's the Ninth Circuit? Ninth Circuit. So isn't that a split in the circuits then? What other circuit court said something different? The D.C. Circuit. Oh, the D.C. Circuit. That's not true, Your Honor. The D.C. Circuit did not make that point. The D.C. Circuit said the FCC could not, as a matter of law, look at the question of common law rights. They only have jurisdiction up to evaluate the Communications Act violations and remanded to look at, to a district court, to look at the common law issues. The Ninth Circuit specifically looked at the question after the fact, such as at the remand point, and says you have no right to recovery of any kind. The D.C. Circuit did not say you're entitled. They just said the FCC did not have authority to evaluate that question on its own. Counsel, if you want us to consider, in case it's not in the brief, please go ahead and follow the proper procedure and submit it after argument today. We will do so. Thank you. You have argued that basically saying the knowledge that you need to be an end user is also knowledge that they were violating the tariff. Isn't that kind of what you're saying when Erickson testified, that that's the same thing? That by saying I know that you need to be an end user, therefore that was an admission that he was in violation, that this was not? Yes, Your Honor. That's true. So how do you square that with the previous case where this court said that FC was simply trying to take advantage of an uncertain regulatory scheme at the time? It seems to me that another interpretation of what you're saying is trying to take advantage of an uncertain regulatory scheme. The difference is this, and that is, and I don't agree with what I'm about to say because I very firmly believe that Mr. Erickson knew he was violating the tariffs from the beginning, but being respectful to Judge Schreier's factual finding. The issue is, all of the decisions that we're talking about, that CELAC has to have a paying end user customer, start in January of 2008. If you read the contract and you took the time to look to see what does this mean, it wouldn't take you long to figure it out. The whole point is, what they were arguing is, it was unclear to me. It would have taken a professional telecommunications person to figure this out. And I was not that, and I relied upon the experts in the field who were the local exchange carriers. I thought they would know. And because of that, I was unsure. If they didn't know, why should I know? That was the essence of the argument. Here, however, as of April of 2008, the decision that impacted his relationship at Iowa had come down in January of 2008, and had made plain to him to the point where he knew he had to be a paying end user customer for tariff access charges to apply. This is no longer some esoteric, I need a professional to help guide me. He's now on notice, and he understood, and he testified as much. That's the distinction. I'm going to move now in my last moments to the inducement of the contract breach. And there is a critical point lost by my opposing counsel on this point. She, free conferencing, excuse me, cites to a number of cases which say, if the contract has already been breached, I can't be responsible for inducing yet another breach. And it misses the entire point. Every single case, every one, that they cite below, the damages that were going to incur, the harm, was incurred by the first breach, the predecessor breaches. Here, every single customer of Techstar has to be evaluated separately. Techstar has about 10,000 customers. About 9,980 comply with the tariff. And Quest has to pay access charges. And so what you have to look and say, did the breach induced by free conferencing cause unique damages to Quest? Because if it does, then this whole theory falls apart. Every bit of the damage Quest seeks here is damage associated with free conferencing. Those damages would not have occurred but for the inducement by free conference. Counsel, are any of the cases that you cite on that point tortious interference cases? I'm not sure I understand Your Honor's question. On your but-for causation argument, are any of the cases that you cite in support of your position tortious interference cases? All of the cases, we cite several tortious interference cases, as does the opposing party on this point. If you look, for example, at restatement section 766, their comment K, it talks about what inducement is. And inducement is any conduct conveying to a third person a desire to influence. And so the question is, when you look at the but-for causation, the whole point here is, but for free conferencing's inducement, would Quest have incurred these damages? And the answer is absolutely not. Because unless they actively solicit, aggressively pursue, as the court's words below, and it's exactly what David Shorenac testified to, aggressively pursue, this contract would have never existed and the damages would have never been incurred. And I see my time is up, and I'm happy to answer any additional questions that any of your honors have. Thank you very much. How much time does counsel have remaining? Two minutes and 24 seconds. Thank you. May it please the court? To answer Judge Grass's question just now, no, none of the cases cited by Quest on this installment contract issue have to do with intentional interference with the contract. And that's key here. We cite the MENA investment cases, as well as a number of other cases where there have been multiple breaches. You cannot continue to assist a breach and still be liable for intentional interference. It's proximate causation. This is clear under the cases. But I'd like to turn back now to this, what I believe to be a misstatement by Quest, that it was clear to the world in January 2008 that the law was clear that what free conferencing was doing with Techstar didn't fit within its contract. It wasn't clear. The Sancom Court in the Eighth Circuit found that. It was a granting of reconsideration and permitting Quest to conduct further discovery. Quest itself was so unsure of the regulatory landscape that it instituted the 50% rule. After it announced it wasn't paying, legal decided, well, it's not really sure we shouldn't stop paying, so let's institute this rule to mitigate our exposure. There was nothing clear in January 2008 about the relationships. It was uncertain. And Judge Schreier in the District of South Dakota in this circuit court found as much. If your honors have no other questions for me, I will now rest on my papers. Thank you. Thank you. Thank you, counsel. We appreciate your arguments this morning and the cases submitted. You may stand aside.